NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

| | | |
|---|---|---|
| NASIR FINNEMAN, | : | The Hon. Joseph H. Rodriguez |
| Plaintiff, | : | Civil Action No. 09-801 |
| v. | : | |
| | : | |
| CITY OF CAMDEN; POLICE OFFICER JOHN MARTINEZ; POLICE OFFICER REVELLI; POLICE OFFICER CARLOS CONCEPCION; POLICE OFFICER A. FIGUEROA; POLICE OFFICERS JOHN DOES #1-5 | : : : | **OPINION** |
| Defendants. | : | |

_____:

Presently before the Court are several motions for summary judgment filed individually by the Defendants, John Martinez [Dkt. No. 32], Patrolman Revelli [Dkt. No. 36], Carlos Concepcion [Dkt. No. 37], and A. Figueroa [Dkt. No. 35], pursuant to Fed. R. Civ. P. 56.  The City of Camden has not filed a summary judgment motion. The Court has considered the written submissions of the parties and the oral arguments advanced at the hearing on September 15, 2011.  For the reasons that follow, the motions are granted in part and denied in part.

## I. BACKGROUND

### A. Facts

Plaintiff Nasir Finneman alleges that he was illegally targeted by several officers of the Camden Police Department for over a year.  In general terms, the Complaint

alleges several violations of the New Jersey and United States Constitutions.  Count I alleges claims of illegal seizure, false imprisonment, and malicious prosecution against Defendants Martinez, Revelli, Concepcion, and Figueroa.  See Compl., ¶¶ 36-41.  Count I also pleads an excessive force claim against Defendants Revelli, Martinez, and Figueroa. Id. Count II alleges civil conspiracy against Defendants Martinez, Revelli, Concepcion, and Figueroa.  See Compl., ¶¶ 42-48.  Count III alleges bystander liability against the same Defendants.  See Compl., ¶¶ 49-52.  Count IV asserts a Custom Policy and Practice claim against Defendant City of Camden.  See Compl., ¶¶ 53-60.

Several separate incidents that occurred between February 23, 2007 and May 30, 2008 form the factual basis for the Complaint.  The first incident occurred on February 23, 2007, when Finneman was allegedly injured during an encounter with Revelli (the "Revelli incident").  Id. at ¶¶ 8-16.  The second incident occurred on October 11, 2007 when Finneman was approached by a police patrol car and then assaulted by Martinez (the "Martinez incident").  Id. at ¶¶ 17-23.  The third incident occurred when Finneman was arrested on March 19, 2008 by Concepcion (the "Concepcion incident").  The fourth incident occurred on May 30, 2008 when Finneman was arrested for Improper Behavior and Disorderly Conduct by Figueroa (the "Figueroa incident").

**1. The Revelli Incident February 23, 2007**

On February 23, 2007 Revelli contends that he received an anonymous tip from an elderly woman claiming that a person was selling drugs in front of a corner store at 6th Street and Royden Street in Camden, New Jersey.  Revelli does not know the identity of the woman, but stated that she associated herself with a town-watch group. Ex. A. Revelli Dep., pp. 58-62.  Revelli had never received information from this

informant before this occurrence.  Id.  Revelli proceeded to the location and found Finneman, among others, standing there, near the corner store.

Revelli claims that Finneman matched the description provided by the tipster of a tall black male wearing a green coat and black pants on the corner of 6th and Royden in front of the corner store.  After he spotted Finneman, Revelli remained in his patrol car and observed him for a while before approaching.

A.      Observed to see what he was doing.  He was basically just standing around, didn't look like he had any purpose to be in front of the store.  He wasn't going in or out of the store to purchase anything and it looked like a couple of people had observed me at 6th and Pine and a few people looked like they had a couple of words with him as they passed by him, don't know exactly what it was because I was maybe a block and a half away.

Q.      You are saying that you first saw him when you were a block away, a block and a half away, you were parked?

A.      Yes.

Q.      And how long were you parked at that location before you did something else?

A.      I'm not sure of the exact amount of time I was there but it was probably a few minutes.

Q.      And then what did you do?

A.      At that point I got a little closer to him, I approached him in my patrol vehicle and as I got closer to him that's when I stepped out of my vehicle because he matched the description at which point I was attempting to go up to him to ask him a few questions, to conduct the interview and at that point as I'm exiting my vehicle before I can actually get my foot on the ground he was saying here goes you fucking cops again harassing me and he kept going on with the cursing and a lot of foul language and at that point everybody in the area basically started to stop and observe what was – the interaction between myself and Nasir Finneman.

Revelli further claims that Finneman was verbally aggressive and irate.

A.      At that point when I approached him all of the cursing all of the people around I basically told him, look, you need to calm down several times, I was telling him calm down, just let me figure out what's going on here before you go but he wasn't listening, he just kept going on with the cursing, looking around, moving everywhere

3

he was just - - you know, wasn't paying attention, it looked to me like he was looking for an escape avenue which he did have but he didn't try to run, he was just kept continuing with the irate behavior, the constant cursing and as I approached him closer I told him, look, you need to stop or I'm going to arrest you for improper behavior, I said, calm down, he said F this, F that, he kept continuing so at that point for my safety and everybody else's safety because he was very irate I just handcuffed him, he didn't really resist but he didn't want me to handcuff him and he kept going with the cursing and the screaming and he became more irate at the point that I was attempting to handcuff him, as I was putting him in handcuffs that's when the van came around.  So I stopped.

Revelli Dep. at 79.

Finneman claims that he exited a convenience store on the corner of 6th Street and Royden Street store with a bag of chips and a soda in hand when Revelli confronted him.  Finneman Dep., pp. 49, 50, 57.  According to Finneman, Revelli exited his patrol car with one hand on his gun, and told him to put his hands up and get against the wall. Id. at p. 37-8.  At this point, Finneman claims that he was illegally seized.  Finneman further states that after he placed his food and drink on a ledge, he complied with all of Revelli's orders and was never belligerent.  Id. at p. 50.  He admitted that he did not immediately comply because he first placed his items on the ledge.  Id.

According to Finneman, Revelli grabbed his mouth, squeezed his jaw, and threw him to the ground, twisting his neck.  Id. at pp. 52, 140.  Finneman alleges that his jaw was broken, but there are no medical records to substantiate that claim.  A search of Finneman's person revealed no illegal substances or weapons.  Instead, Finneman was charged with violating several Camden Municipal ordinances.

Q.   And what Municipal Code Section did you charge him with?
A.   That is at 395-8.
Q.   And what were the acts that gave rise to you charging him with offensive language?

4

A.     Well, due to the area that it was, a lot of children around, the group, the people that started to stop and actually see what was going on with the investigation or the interaction between myself and Mr. Finneman.

Q.     What did you charge him with in 19?

A.     19 is frequenting a disorderly area which is 395-5.

Q.     And what were the acts that you believe, Mr. Finneman's acts that you believe gave rise to charging him with frequenting a –

A.     Disorderly area?

Q.     Disorderly area?

A.     That is a high crime are known for the sales of drugs, violent crime and guns.

Q.     Well did you arrest anyone else for frequenting a disorderly area who was there that night?

A.     I'm not a hundred percent sure.

Q.     Well, weren't all the other people who were on the corner also – weren't they frequenting a disorderly area?

A.     I was only investigating Mr. Finneman at that time.

Revelli Dep., at 85-6.

Finneman acknowledges that he was at the location pinpointed by the tipster, but claims he did not match the description given and was not involved in a drug transaction.  Also, Finneman claims he is not tall and that he was wearing blue jeans and not black pants as identified by the tipster.

Finneman claims that he was, at all times, compliant and never used profanity or loud language during the incident.  He states that there were others in the area who could have been searched or ticketed for "frequenting a disorderly area" but that he was targeted in retaliation for filing an Internal Affairs Complaint against Officer Gallazi.  Although Finneman was arrested, the charges were dismissed on November 11, 2007.

**2. The Martinez Incident October 11, 2007**

Officer Martinez claims that he was responding to a radio report of shots fired when he encountered Finneman on October 11, 2007.  Martinez Dep. at 23.  The radio

5

report also identified the shooter as a black male traveling by bicycle heading towards Broadway Avenue in Camden.  Id.  According to Martinez, when he and his partner, Officer Sanchez, came upon Finneman, he continued to pedal away from the officers and cursed at them.  Id. at 27-8.  After being ordered to do so, Finneman stopped but shoved his hands into the pockets of the black sweatshirt he was wearing.  Id.  This prompted Martinez to order him to show his hands.  Id.  Finneman refused and continued hurling expletives at the officers.  Id. at 29.

Martinez drew his weapon and commanded Finneman to show his hands.  Id. This time, Finneman complied.  Then Martinez ordered him to get off of the bicycle but Finneman refused, causing Martinez to grab him and pull him off of the bike and onto the ground.  Id.  Martinez placed Finneman in handcuffs and issued him a summons for several Municipal ordinances.  Id. at 33.

Martinez claims he asked Finneman about the reported gunshots once Finneman was in the patrol car.  Nothing was found on Finneman's person, and Martinez does not believe the shooter was ever located.  Martinez did not write a report about the incident and is unaware if any of the other officers on scene authored a report.  In addition, no one can find a complete copy of the summons issued to Finneman. Id. at 41-44.

Finneman claims that he was riding his bike when Martinez jumped out of his patrol car. Ex. B., Finneman Dep., 244-48.  Finneman testified that he was immediately cooperative and that he complied with all of Martinez's commands.  Id.  However, Finneman told Martinez that he was going to call the police, because he believed the police were targeting him.  Id.  Martinez responded by punching him in the face and striking him with a flashlight behind Plaintiff's ear.  Then, Martinez threw him to the

ground and he was handcuffed and placed back in the car.  Id.

Finneman claims that he was never asked by Martinez about the alleged shooting in the area.  Id.  Instead, Martinez asked him for identification and then issued him a citation for Obstructing the Administration of Justice and for failing to have a light on his bicycle.  Id.  Both charges were dismissed on February 15, 2008.

### 3. The Concepcion Incident March 19, 2008

On March 19, 2008, Finneman claims that he was on his way to meet a girl named Jessica (last name unknown), who allegedly lived near an alley way on Mt. Vernon Street in Camden, N.J.  Ex. A. Finneman Dep. 94.  Finneman claims that he was exiting the alley when he was approached by Concepcion, who ordered him to get on the ground.  Id. at 94, 98, 169.  Officer Revelli was also on the scene.  Although he was compliant, Finneman was placed in the patrol car, then searched.  Id. at 98, 171.  Nothing was found during the search of Finneman's person or in the alley.  Id.  Finneman was charged with "frequenting a disorderly area" and released.

Concepcion claims that Finneman was engaged in a drug transaction and, when approached by Concepcion, ran down the alley.  Because Finneman was in an area "used in the past to conceal drug activity, and police have had numerous foot pursuits at said location," Concepcion claims that probable cause existed for a summons for frequenting a disorderly area. Concepcion Br. at 9

Finneman denies that he was involved in a drug transaction and that he ran. Again, nothing was found on Finneman's person.  Moreover, there is no Camden Ordinance for "frequenting a disorderly area."  Finneman was actually charged with violating City of Camden Ordinance § 395-5 "Maintaining and Frequenting Disorderly

7

Houses" which provides:

> A. No person shall keep or maintain a disorderly house of allow or permit any house, shop, store or other building or structure owned or occupied by such person to be used as a disorderly house.
> B. No person shall resort to, frequent or be present in any house, shop, store or other building or structure which is a disorderly house.
> C. For the purpose of this section, a "disorderly house" shall include, but not be limited to, a place where gambling or prostitution is engaged in or a place where the narcotic laws of this state are being violated or any other place where the law is being violated.

Finneman claims that there was no basis for issuing this citation and that, as applied to him, the ordinance is unconstitutional.  This charge was also dismissed.

### 4. The Figueroa Incident May 30, 2008

According to Figueroa, on May 30, 2008 he was responding to a radio call that alerted him to gunshots in the area of 4th and Chestnut Streets in Camden.  Figueroa Dep., pp. 14-15.  The call included a description of the alleged shooter, however, there is no record of the radio call and, during his deposition, Figueroa was unable to articulate the description of the shooter that lead him to suspect Finneman.  Figueroa Dep. at 14-15.  However, Figueroa stated that at the time of the incident he believed Finneman matched the description that he heard on the radio call and that Finneman was walking in the area.  Id.  He claims that he exited the car and told Finneman to put his hands up.  Id. at 19.   Finneman was belligerent but cooperated.  Figueroa patted him down and did not find any weapons.

Figueroa attempted to get Finneman's identification and tried to explain to him what was going on.  Id.  But Finneman continued to scream, be irate, and curse.  Id.  His screaming created a disturbance that caused the residents to come out of their homes

8

and onto the street.  Id. at 20.  Figueroa claims that he did not ask Finneman about the gunshots until he restrained him in the police car.  There is no evidence of any other efforts to investigate the shootings after Finneman was ticketed for improper behavior.

According to Plaintiff, he was on his way back from a walk when the encounter with Figueroa occurred.  Finneman Dep. at 190-192.  Finneman states that he was between Chestnut and Mount Vernon Streets in Camden at approximately 2:42 in the morning and that he was exercising when Figueroa came up behind him in his police patrol car. Id. at  192-196.

> Q.   All right.  And how is it that Officer Figueroa came upon you?
> A.   Well, I heard an engine rev up.  Then I looked back, and it was a paddy wagon, and he slammed on the brakes, and he jumped out with his hand – pointing the gun at me.
> Q.   He had a gun in his hand?
> A.   Yes. And he told me to get down on the ground.
> Q.   And before that you weren't doing anything other than leisurely walking?
> A.   Just walking.

Id.

Finneman claims that he was on the same side of the street as the paddy wagon and that Figueroa exited the patrol car with his gun drawn and pointed at him. Id. Figueroa directed him to get on the ground and he immediately complied.  Id. at 195. He agrees that it was quiet and that the area is residential, without the presence of any churches or schools. Id. at 196.  During the altercation, Finneman claims that he never used any profanity and that he did not say anything to Officer Figueroa while he was restrained on the ground.  Id. at 199-200.  Also, no one on the scene, including Figueroa, told him why he was under arrest.  Id. at 201-02.  He claims that he obeyed the directive and "simply got on the ground" and remained there "in silence."  Id. at 202.  He also

denies eluding the police.

Finneman was issued citations for several violations of Camden Municipal Ordinances, including Improper Behavior. These charges were dismissed after Plaintiff went to Municipal Court to defend himself on three occasions.

### B. Procedural

The Complaint was filed on February 23, 2009. Defendants' motions were filed in February 2011. In opposing the motions, Plaintiff agrees that the claims for excessive force and bystander liability should be dismissed as to Concepcion and that the claim for bystander liability against Martinez and Figueroa should be dismissed. Pl. Opp. Brs. at 1.

Officer Revelli claims that he is entitled to qualified immunity. He also seeks summary judgment on the claims of excessive force, bystander liability, civil conspiracy, and the state claims. Defendant Figueroa seeks summary judgment on all of the claims on qualified immunity grounds. Defendant Martinez moves for partial summary judgment on the claims of civil conspiracy and punitive damages. He does not invoke qualified immunity. Officer Concepcion seeks summary judgment as to all of the claims in Count I, the conspiracy claim and the punitive damages claim. He also does not invoke qualified immunity.

## II. Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson, 247 F.3d at 482 n.1 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56 (c). Thus, this Court

10

will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Andersen, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)). Indeed,

the plain language of Rule 56(c) mandates the entry of summary

judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex, 477 U.S. at 322.

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  Credibility determinations are the province of the fact finder.  Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

### III. Analysis

Plaintiff's Constitutional claims are governed by Title 42 U.S.C. § 1983, which provides a civil remedy against any person who, under color of state law, deprives another of rights protected by the United States Constitution.  See Collins v. City of Harker Heights, 503 U.S. 115, 120 (1992).  A Plaintiff must demonstrate two essential elements to maintain a claim under § 1983: (1) that the Plaintiff was deprived of a "right or privileges secured by the Constitution or the laws of the United States" and (2) that Plaintiff was deprived of her rights by a person acting under the color of state law. Williams v. Borough of West Chester, Pa, 891 F.2d 458, 464 (3d Cir. 1989).

The parties agree that the Defendants were acting under the color of law.  While only the first element of Plaintiff's § 1983 claims is at issue, two of the Defendants claim that they are immune from suit.  Thus, the Court will address whether the doctrine of qualified immunity applies to Defendants Figueroa and Revelli.

### A. Qualified Immunity

The doctrine of qualified immunity provides that "government officials performing discretionary functions . . . are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Thus, government officials are immune from suit in their individual capacities unless, "taken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right" and "the right was clearly established" at the time of the objectionable conduct. Saucier v. Katz, 533 U.S. 194, 201 (2001). Courts may exercise discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. Pearson v. Callahan, 129 S. Ct. 808, 818 (2009).

### 1. Whether The Officer's Conduct Violated A Constitutional Right
### a. Illegal Seizure

Plaintiff alleges as to Defendants Revelli and Figueroa that he was illegally seized because there was no basis for the officers to conduct a brief investigatory stop in violation of the Fourth Amendment. The Fourth Amendment ensures "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A seizure occurs when a suspect submits to "a show of authority" by the police. See United States v. Brown, 448 F.3d 239, 245 (3d Cir. 2006) (citing California v. Hodari D., 499 U.S. 621, 626 (1991)). A show of authority exists when a reasonable man would have understood the officer's words and

actions to restrict his movement.  Hodari D., 499 U.S. at 628.

For a seizure to be constitutionally reasonable, "it must be effectuated with a warrant based on probable cause."  See United States v. Brown, 448 F.3d 239, 245 (3d Cir. 2006) (quoting United States v. Robertson, 305 F.3d 164, 167 (3d Cir. 2002).  One exception to the warrant requirement occurs when an officer conducts a brief investigatory stop.  A brief investigatory stop is a "seizure" subject to Fourth Amendment protection.  Johnson v. Campbell, 332 F.3d 199, 205 (3d Cir. 2003).  An investigatory stop by the police is consistent with the Fourth Amendment "when the officer has a reasonable, articulable suspicion that criminal activity is afoot."  Illinois v. Wardlow, 528 U.S. 119, 123 (2000); see also Terry v. Ohio, 392 U.S. 1, 30 (1968) (holding that a police officer's search of citizens for weapons comported with the Fourth Amendment when the men paced twenty-four times outside a store and continuously looked in the store widow, and when, in light of the officer's experience, he reasonably believed the men to be poised to commit a daytime robbery).

Applying the reasonable suspicion standard is no easy task.  See United States v. Arvizu, 534 U.S. 266, 274 (2002) (describing the standard as "abstract") and United States v. Cortez, 449 U.S. 411, 417 (1981) (describing the standard as "elusive").  The test to determine whether an articulable, reasonable suspicion exists is an objective one, judged by factors known to the officers *before* the investigatory stop is made.  See United States v. Valentine, 232 F.3d 350, 358 (3d Cir. 2000) (citing Florida v. J.L., 529 U.S. 266, 271 (2000)) (emphasis added).  Courts must examine the totality of the circumstances to determine whether the requisite "particularized suspicion" is present. United States v. Nelson, 284 F.3d 472, 478 (3d Cir. 2002).  In conducting the totality of

14

the circumstances test, each factor must not be judged in isolation.  See Arvizu, 534 U.S. at 274 (holding that Terry "precludes ... divide and conquer analysis").  Such analysis is precluded because each factor may seem innocent in isolation, but when viewed collectively creates sufficient reasonable suspicion for "further investigation."  Terry, 392 U.S. at 22.

### i. Officer Christopher Revelli February 23, 2007

There are genuine issues of fact related to the reliability of the tip that preclude the Court from conducting a qualified immunity analysis.  Viewing the facts in a light most favorable to Finneman, he was seized as Revelli stepped out of the car with one hand on his gun and told Finneman to get up against the wall with his hands up.  Thus, the Court must determine whether Revelli possessed a reasonable suspicion to conduct the stop.[1] At the heart of that inquiry is the tip upon which Revelli relied.

Where an investigatory stop is based primarily on information provided to the police by an informant, the reasonableness of the stop depends on the reliability of the informant.  United States v. Goodrich, 450 F.3d 552, 560 (3d Cir. 2006).  Generally, the Court considers five factors to assess the reliability of a tip.  United States v. Brown, 448 F.3d 239, 244 (3d Cir. 2006).  Commonly referred to as the Brown factors, the Court

---

[1] Revelli was free to question Finneman about the tip without running afoul of the Fourth Amendment.  See Florida v. Bostick, 501 U.S. 429, (1991) ("Since Terry we have held repeatedly that mere police questioning does not constitute a seizure.").  Revelli claims he was attempting to talk to Finneman, but Finneman became irate provoking the incident.  Because Finneman disputes this and claims that Revelli, with a hand on his gun, ordered him against a wall with his hands up, the Court must view the incident as a stop, and not merely police questioning. Id. ("Our cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions. [. . .]  The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature.")

considers (1) whether the tip information was relayed to the officer face-to-face, giving the officer the ability to assess the tipster's credibility; (2) whether the tipster provides personal information so that the tipster can be held responsible for providing; (3) whether the content of the tip is information readily observable; (4) whether the tipster recently witnessed the alleged criminal activity, and; (5) whether the tip includes information that predicts the next step of the alleged criminal.  United States v. Torres, 534 F.3d 207, 211 (3d Cir. 2008).

"Not every factor is necessary for reasonable suspicion ... [and] there are no magic combinations that guarantee reasonable suspicion in every case."  United States v. Carstarphen, 298 F. App'x. 151, 156 (3d Cir. 2008).  To bolster the reliability of the Brown factors, police may also consider other indicators including whether the suspect (1) is in a known high-crime area; (2) is on the street at a late hour; (3) exhibits nervous or evasive behavior; and (4) exhibits any behavior consistent with criminal activity. Torres, 534 F.3d at 211.  Accordingly, the Court must view the tip within the "totality of the circumstances" confronting the police officer to evaluate whether the officer had a reasonable suspicion upon which to act. Nelson, 284 F.3d at 478 ("The Supreme Court has repeatedly recognized that a reasonable suspicion may be the result of any combination of one or several factors ...").

In Goodrich, the Third Circuit found that despite an informant's vague tip, the police's previous relationship with the informant, the informant's providing real-time narration of the suspicious behavior, and the suspicious activity matching a pattern of criminal activity of which the police were aware contributed to the reasonableness of the officer's decision to stop the defendant.  Id.  Additionally, the Third Circuit considered to

16

be reliable, an informant who, in-person, tipped the police off about a street crime that happened only seconds before; the narrow window between the tip and the seizure allowed the police to base the reliability of the tip on the informant's voice and observable demeanor.  United States v. Valentine, 232 F.3d 350, 355-57 (3d Cir. 2000).  Conversely, the Supreme Court deemed an anonymous tip to be an unreasonable basis for a Terry stop when the unknown informant provided police with no insight into why he knew about the defendant or the defendant's gun, and therefore left the police without a means for testing his credibility.  J.L., 529 U.S. at 271.

    Here, the Brown factors are inconclusive.  Although the tipster personally relayed the information to Revelli, she did not disclose her identity to him, undermining her credibility.  Even if she recently witnessed that which she told Revelli, there is a dispute as to the validity of the tip.  Finneman disputes that he matched the description given by the tipster.  Finneman is not tall and claims he was not wearing the same color pants.  And there is no information as to why the tipster knew that criminal activity was afoot.  "An accurate description of a subject's readily observable location and appearance . . . does not show that the tipster has knowledge of concealed criminal activity."  J.L., 529 U.S. at 272.  An investigatory stop is proper only when a police officer's reasonable suspicion of criminal activity leads the officer to target the particular person for the stop.  Cortez, 449 U.S. at 417-18.  In J.L., the Supreme Court found a tip about a young black male standing at a particular bus stop, wearing a plaid shirt, and carrying a gun an unreliable basis for reasonable suspicion, even though a police frisk of a black man in a plaid shirt at the bus stop described produced a gun.  See J.L., 529 U.S. at 267-74.  Unlike J.L., there is a question as to whether Finneman matched the description and no illegal

activity was observed by Revelli or revealed during a search of Finneman's person.

In addition, there is nothing else in the record that suggests that criminal activity was afoot. Revelli admits that before he approached Finneman, he observed him for several minutes; Finneman was just standing there holding his chips and soda. Revelli Dep. at 79. Cf., United States v. Coleman, 383 Fed. Appx. 180, 186 (3d Cir. 2010) (validating a tip because the officer's suspicion "was also informed by his knowledge that [the defendant] was sitting on a porch in a high-crime area at a late hour, that [defendant's] posture was consistent with someone concealing a weapon, and by [defendant's] strange response to the patrolmen's approach.) (citing Torres, 534 F.3d at 211). Unlike the facts in Coleman, there does not appear to be any other factors that would have bolstered the reliability of the alleged tip.[2]

The present facts are also distinguishable from the tip in Valentine, because the totality of the present circumstances do not support the tip as sufficiently trustworthy on summary judgment. 232 F.3d 350. In Valentine, the Third Circuit found reliable a tip based on the following circumstances: "the informant was exposed to retaliation from Valentine and knew that the officers could quickly confirm or disconfirm the tip; and the officers could assess the informant's credibility as he spoke, knew what the informant looked like, and had some opportunity to find the informant if the tip did not pan out." Id. at 355. Revelli's informant was not able to be held accountable.

According to Revelli, nothing about Finneman's demeanor was suggested of criminal activity. And viewing the facts in a light most favorable to Finneman, he never

---

[2] Even if Finneman was on a known drug corner, there were other people in the area and Revelli did not witness any illegal activity.

cursed at Revelli or caused a disturbance.  While mere police questioning does not support a seizure, the fact that Finneman claims he was not free to move calls into question the circumstances of the incident.  See Bostick, 501 U.S. at 434 (mere police questioning does not constitute a seizure.). Given the questions related to the reliability of the tip and the dispute as to the circumstances of the incident, Finneman may have been illegally seized and, as a result, Revelli is not entitled to qualified immunity under this part of the test.

### ii. Officer Figueroa May 30, 2008.

Viewing the facts in a light most favorable to Finneman, he was seized when Figueroa exited his patrol car with his gun pointed at Plaintiff. See California v. Hodari D., 499 U.S. 621, 627–28,(1991) (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1986) (opinion of Stewart, J.) ("[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.")).  There is also a question as to whether Finneman matched the description of shooter identified in the alleged radio call.  The radio call, if it exists, is unavailable for production and Figueroa cannot recall the description contained therein.  Thus, viewing the facts in a light most favorable to Finneman, at this time, there are credibility questions related to when Finneman was actually seized and whether there was a reasonable suspicion for Figueroa to stop Finneman. Figueroa is not entitled to qualified immunity under this element of the test on the claim of illegal seizure.

### b. Excessive Force

"To state a claim for excessive force as an unreasonable seizure under the Fourth

Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." Curley v. Klem, 499 F.3d 199, 203 n. 4 (3d Cir. 2007) (quoting Abraham v. Raso, 183 F.3d 279, 288 (3d Cir.1999)) (quotation marks omitted).  The facts alleged by Plaintiff demonstrate an illegal seizure in both the Revelli and Figueroa incidents.

The proper analysis of an allegation of excessive force considers the particular force used in the light of the surrounding circumstances of the incident.  Graham v. Connor, 490 U.S. 386, 396 (1989).  In Graham, the Supreme Court held that all claims of police use of excessive force are properly analyzed under the Fourth Amendment's "objective reasonableness" standard.  Id.  "Because police officers are often forced to make split second judgments . . .  about the amount of force that is necessary in a particular situation, the reasonableness of the officers' belief as to the appropriate level of force should be judged from that on-scene perspective."  Saucier, 533 U.S. at 205.  Thus, Courts must carefully scrutinize allegations of excessive force with respect to the circumstances surrounding each incident. Graham, 490 at 397.

It is well settled that "[p]olice officers are privileged to commit a battery pursuant to a lawful arrest."  Groman v. Twp. of Manalapan, 47 F.3d 628, 634 (3d Cir. 1995).  However, the use of force must be "objectively reasonable" and "evaluated under the totality of the circumstances."  Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997).  "Factors to consider in making a determination of reasonableness include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he actively is resisting arrest or attempting to evade arrest by flight."  Kopec v. Tate, 361 F.3d 772, 776-77 (3d Cir. 2004) (citing Graham, 490 U.S. at 396).

Here, given the factual disputes between Plaintiff's version of events and Defendants' version of events, it is difficult to ascertain "the circumstances . . . at hand." Pearson, 129 S. Ct. at 818; see also Graham, 490 U.S. at 396. However, viewing the facts in a light most favorable to Plaintiff, there is a question of fact related to whether the force employed by the officers was objectively reasonable under the circumstances of both incidents.

In both the Figueroa and the Revelli incidents, Plaintiff was given citations for conduct unrelated to the alleged activities that formed the basis for the initial stop. Revelli, after receiving a tip about a drug transaction, but witnessing no illegal activity after observing Plaintiff himself, grabbed Plaintiff by the mouth and threw him to the ground. There is nothing in the record to suggest that Finneman posed a threat to Revelli, or anyone else in the area, or that he had a weapon. In addition, Finneman states that he was compliant and composed during the incident.

According to Plaintiff, Figueroa initiated the stop by pointing his gun at Plaintiff. Figueroa argues that because Plaintiff did not suffer any physical injury as a result of the incident, his claim for excessive force must fail. Figueroa's argument misses the mark. See Sharrar, 128 F.3d at 822 ("We do not agree that the absence of physical injury necessarily signifies that the force has not been excessive, although the fact that the physical force applied was of such an extent as to lead to injury is indeed a relevant factor to be considered as part of the totality.") (citations omitted). Courts have held that the pointing of a gun can constitute excessive force under certain circumstances. Id. (discussing cases).

Given the factual extremes of the circumstances underlying the Figueroa incident,

21

it is difficult to assess the reasonableness of Figueroa's actions and their alleged impact

on Finneman.  Under Finneman's version of the facts, he was not eluding police and

immediately complied with Figueroa's demands.  He also claims that he was not involved

in a shooting and no weapon was found.  As a result, few of the <u>Graham</u> factors favor the

type of force employed by Figueroa.

Moreover, the fact that Figueroa ceased his investigation of the alleged gun shots

in the area to issue Finneman a ticket for failing to have a light on his bike calls

Figueroa's credibility into question and suggests that Figueroa may not have been fearful

for his safety when he pointed his weapon at Finneman- under Finneman's version of

events.  As a result, "the facts alleged show the officer[s'] conduct [may have] violated a

constitutional right" and the Defendants are not entitled to qualified immunity under

this prong of the doctrine.  <u>Saucier</u>, 533 U.S. at 201.

### c. Malicious Prosecution

In order to prevail on a claim of malicious prosecution, a litigant must

demonstrate that: "(1) the defendants initiated a criminal proceeding; (2) the criminal

proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without

probable cause; (4) the defendants acted maliciously or for a purpose other than bringing

the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with

the concept of seizure as a consequence of a legal proceeding." <u>McKenna v. City of</u>

<u>Philadelphia</u>, 582 F.3d 447, 461 (3d Cir. 2009).

There is no dispute that, in each instance, Finneman was cited by the Defendants

and the charges were eventually dismissed.  As previously discussed, there are questions

of fact as to whether probable cause existed for the citations issued, as Finneman claims

that he was in all incidents cooperative.

Also, the citations issued appear to be inconsistent with the actual ordinances. For example, Finneman was cited for violating §395-8 for Improper Behavior. However, that ordinance is titled Disturbances Near Quiet Facilities and there is no citation for Improper Behavior. Likewise, Finneman was cited for a violation of §395-5 for Frequenting a Disorderly Area. There is no such violation and that section of the code is actually titled Maintaining and Frequenting Disorderly Houses. Whether or not the officers had a reasonable basis to believe that they were issuing proper citations or that the conduct they were citing was addressed by the citation issued is immaterial because, as Defendants acknowledged during oral argument, none of the charges against Finneman were contested in court and that the charges were all eventually dismissed.[3] This fact is enough to suggest that the citations were meant to harass, rather than address wrongful behavior and permits Plaintiff to proceed past summary judgment and present this claim to a jury. Questions of fact related to the behavior of Finneman and the citations issued preclude a finding of qualified immunity for Defendants Revelli and Figueroa at this stage of the litigation.

### d. False Imprisonment/ False Arrest

In order to prove a claim of false arrest, Finneman must show that the police lacked probable cause for the arrest. See Groman, 47 F.3d at 634. "[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge

---

[3] Defendants contend that the charges against Plaintiff were all dismissed because the officers failed to appear in court on the hearing dates. Defendants all claimed that they were not informed of the dates by the City of Camden and that they never received subpoenas to appear in Municipal Court.

are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." Orsatti v. New Jersey, 71 F.3d 480, 483 (3d Cir. 1995). The question of whether probable cause existed is often a question for the jury. See Groman, 47 F.3d at 635. In this case, there are factual questions related to probable cause that preclude qualified immunity from attaching at this time.

### 2. Whether the Right was Clearly Established

The Defendants may still be entitled to qualified immunity if Finneman's rights were not clearly established at the time of the alleged illegal conduct. For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Saucier, 533 U.S. at 202  (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  That is, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Couden v. Duffy, 446 F.3d 483, 492 (2006).  "If the officer's mistake as to what the law requires is reasonable," the officer is entitled to qualified immunity.  Couden, 446 F.3d at 492 (internal citations omitted).  Further, "[i]f officers of reasonable competence could disagree on th[e] issue, immunity should be recognized." Malley v. Briggs, 475 U.S. 335, 341 (1986).  See also Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (The general touchstone is whether the conduct of the official was reasonable at the time it occurred.).  Finally, because qualified immunity is an affirmative defense, the burden of proving its applicability rests with the defendant.  See Beers-Capital v. Whetzel, 256 F.3d 120, 142, n.15 (3d Cir. 2001).

The same factual disputes identified above apply to the Court's analysis of whether

the rights were clearly established at the time the Defendants Revelli and Figueroa encountered Finneman.  Here, in each instance, the facts that lead the officers to engage Finneman are disputed by the parties preventing the Court from determining whether the officers' conduct was reasonable in light of what they confronted.[4]  Viewing the facts in a light most favorable to Finneman, it would seem that his rights were clearly established at the time of the incidents and qualified immunity does not attach at this stage of the litigation.

Defendants Figueroa and Revelli are not entitled to qualified immunity at this time.

### B. Plaintiff's § 1983 Claims

Officer Martinez does not move for summary judgment as to Plaintiff's constitutional claims.

### i. Officers Revelli and Figueroa

There are credibility questions related to whether Plaintiff was deprived of a "right or privileges secured by the Constitution or the laws of the United States." Williams, 891 F.2d at 464.  As a result, for the same reasons that Defendants Figueroa and Revelli are not entitled to qualified immunity at this juncture, summary judgment on Plaintiff's § 1983 claims is denied as to Defendants Revelli and Figueroa.

---

[4] In Revelli's case, even if one could argue that Finneman's act of placing his drink down before he put his hands up demonstrates that he was non compliant, these actions- at this juncture- would still fail to support as reasonable Revelli's actions as alleged by Finneman.  Specifically, Finneman's delay in complying would not provide a reasonable basis for Revelli to grab Finneman's mouth and threw him to the ground.

### ii. Officer Concepcion March 19, 2008

Officer Concepcion moves for summary judgment on all of the claims contained in Count I of the Complaint.  Concepcion claims that he observed Finneman participating in a drug transaction and that when he approached him, Finneman ran down the alley. Finneman disputes this version of events, claiming that he was in the alley to meet a girl named Jessica and he denies that he ran.  Concepcion recognizes the factual dispute but claims that even if Finneman is believed, probable cause existed for issuing Finneman a citation for "Frequenting a Disorderly Area" in violation of Municipal Ordinance § 395-5[5] because Finneman was in a known high crime area.

Accepting Finneman's version of the facts, as is required at this stage in the litigation, it is not enough that Finneman was present in a high crime area. See Brown v. Texas, 443 U.S. 47, 52 (1979 ("The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct.").  Standing alone, Finneman's presence in the alley, an area known to host a high rate of drug activity, does not establish probable cause for the stop.  Otherwise, anyone who passed through or lived adjacent to that alley, without more, would be subject to a Terry stop.

In addition, it does not appear that this Ordinance would apply to Finneman, unless Concepcion attempted to construe the last part of subsection (c), which states "any other place where the law is being violated," as encompassing the alley. See supra., p. 7. Finneman argues that this is unconstitutionally too broad.  The Court need not reach that

---

[5]       As discussed supra, at p. 7, that Ordinance is actually titled "Maintaining and Frequenting Disorderly Houses."

question at this time because under Finneman's version of the facts, no laws were being violated.  Based on the record before the Court, there are questions of fact related to probable cause that preclude summary judgment on the illegal seizure and false imprisonment issue.  Also, given the curious application of the citation to Finneman and the fact that the charges against him were ultimately dismissed, summary judgment on the malicious prosecution claim is also denied.

### C. Punitive Damages Claim

Punitive damages are available for claims under 42 U.S.C. § 1983 "when a defendant's conduct is shown to be motivated by evil motive or intent, when it involves reckless or callous indifference to the federally protected rights of others."  Smith v. Wade, 461 U.S. 30 (1983).  At this juncture, viewing the facts in a light most favorable to Finneman, there are questions of fact related to the Martinez and Revelli incidents that preclude summary judgment.

With respect to Martinez, Finneman claims that he complied with the officer's instructions and that he was assaulted after telling Martinez that he was going to call the police because he felt harassed.  Revelli grabbed Finneman's mouth and threw him to the ground, twisting his neck, after Revelli had observed Finneman for a few minutes from his patrol car and did not see any illegal activity.  In light of the factual disparities in the record related to the circumstances of the encounters between both Officers and Finneman, and the fact that none of the charges against Finneman were contested in Municipal Court, punitive damages may be warranted and summary judgment is denied with respect to Revelli and Martinez.

In addition, summary judgment on punitive damages is denied as to Figueroa

27

because there are credibility issues related to the circumstances of the incident that preclude the Court from considering whether Figueroa brandished his gun in a reckless or malicious manner that warrants punitive damages.

However, summary judgment is granted as to Concepcion on the issue of punitive damages because it does not appear that Finneman has opposed this issue. There is no argument in the opposition brief that sets forth any facts that support a punitive damages claim against Concepcion. The nature of the incident between Finneman and Concepcion was non-violent and brief. While there is a question as to probable cause, there is no evidence suggesting that Concepcion acted maliciously or recklessly. See Savarese v. Agriss, 883 F.2d 1194, 1205 (3d Cir. 1989) ("punitive damages in general represent a limited remedy, to be reserved for special circumstances"). As a result, summary judgment is granted as to Concepcion on the issue of punitive damages.

**D. Bystander Liability**

To make out a prima facie case of failure to intervene, a plaintiff must prove that an officer had a duty to intervene, the officer had a realistic and reasonable opportunity to intervene, and that the officer failed to intervene. Smith v. Mensinger, 293 F.3d 641, 650-51 (3d Cir. 2002).

Plaintiff's briefs in opposition to the motions suggest that he is not pursuing a bystander liability claim against Revelli, Concepcion, or Martinez. See Pl. Opp. Br. Revelli, at 37; Concepcion, 1; Martinez, 1. During oral argument, counsel for Figueroa averred that Plaintiff was not contesting Figueroa's motion for summary judgment as to bystander liability. Plaintiff never challenged this assertion in his brief or during the hearing and therefore, the Court finds that Plaintiff is not pursuing claims of bystander

28

liability against Figueroa.

Despite the representation that there is no claim for bystander liability against Revelli contained in Plaintiff's opposition brief to Revelli's motion, counsel for Revelli argued the merits of that claim during oral argument.  No counter argument was made by Plaintiff as to bystander liability.  Given that Plaintiff did not challenge this claim in the briefing as to any Defendant and thereby failed to direct the Court to any evidence in the record that would suggest that any of the officers, arriving on the scene as backup, had a reasonable opportunity to intervene in the arrests of Finneman, summary judgment as to the claims of bystander liability set forth in Count III of the Complaint is granted as to all of the Defendants. Fed. R. Civ. P. 56 (e)(2) & (3).

**E. Conspiracy Claims**

In order to prevail on a conspiracy claim under § 1983, a plaintiff must prove that persons acting under color of state law conspired to deprive him of a federally protected right.  Ridgewood Bd. Of Educ. v. N.E. ex re. M.E., 172 F.3d 238, 254 (3d Cir. 1999). Plaintiff claims that the fact that he was repeatedly investigated without probable cause, cited for minor municipal infractions unrelated to the suspected criminal activity, and forced to appear in Court where the charges were eventually dismissed is evidence of the conspiracy.  The Court disagrees.

The fact that Finneman was investigated, on four separate incidents, for serious offenses that never materialized and was, instead, cited for violating Camden Municipal Ordinances is more than curious.  As the parties acknowledged during oral argument, the record before the Court demonstrates that the officers never found any illegal substance or weapon on Finneman's person during the investigatory stops.  In addition, on two

29

occasions the police were allegedly investigating shots in the area, yet they halted their investigation of the gun shots- even after finding no weapon on Finneman- to issue Finneman citations for petty Municipal infractions.  And all of the charges against Finneman were eventually dismissed.

Collectively, these facts raise a question as to the alleged conduct of the police. However, there is no evidence in the record that demonstrates that Finneman was the agreed upon target of these practices.  Finneman has presented no evidence of a conspiracy linking the Defendants to a cause against him.  He is unaware of whether the officers spoke to each other about targeting him and he knew of no agreement before the dates of the incidents that would suggest a motive for targeting him. See Finneman Dep. 105-8.  In addition, the temporal proximity of the incidents is not indicative of a conspiracy; the incidents are too remote and isolated from each other and there is no evidence that the police were out patrolling for Finneman.

In two of the cases, the police cannot produce the radio call for gun shots.  And in both cases, the officers decided to take time to issue citations to Finneman for Municipal infractions instead of pursuing the alleged report of gunshots that lead them to Finneman in the first place.  While the facts alleged by Plaintiff unquestionably allege questionable police conduct, these facts appear to be relevant to his Monell claim against the City and not indicative of a civil conspiracy among the individual police officers in this case.

In addition to the overarching theory of conspiracy among all of the actors in the four incidents, Plaintiff claims that Martinez conspired with Officer Sanchez, another officer on the scene of the Martinez incident.  According to Plaintiff, that fact that he has

elected not to sue Sanchez as part of the conspiracy is immaterial because in a civil rights conspiracy claims a plaintiff may elect to sue only one conspirator.  Norton v. Cobb, 744 F.Supp. 798 (N.D. Ohio 1990).  Although Plaintiff is correct in his recitation of conspiracy pleading requirements, there is nothing in the record to support a conspiracy claim against Martinez.  The fact that he spoke to another officer on the scene of the incident, without more, does not support the claim.

The Court finds that the record does not support a claim of conspiracy.   As a result, summary judgment is granted as to the conspiracy claims against the police officer Defendants.

### F. The State Claims

In addition to alleging violations of the Fourth Amendment of the United States Constitution, the Complaint also alleges that the unconstitutional conduct of the Defendants violates Article I, Paragraph 7 of the New Jersey Constitution.

Revelli is the only Defendant who moves to dismiss these "state claims."  He argues that the claims plead in the Complaint allege torts, particularly the excessive force claim, and must be dismissed subject to the notice provisions of the New Jersey Tort Claims Act, N.J.S.A. 59:1–1 to 12–3 and for failure to pierce the tort claims threshold. Revelli's motion is denied because the claims allege constitutional violations, which are not subject to the strictures of the New Jersey Tort Claims Act.  Owens v. Feigin, 194 N.J. 607, 610-11 (2008).

Moreover, Article I, Paragraph 7, the State's counterpart to the constitutional protections of the Fourth Amendment, prohibits unreasonable searches and seizures. See State v. Golotta, 178 N.J. 205, 837 A.2d 359, 363 (N.J. 2003).  Thus, excessive force

claims under the New Jersey Constitution are analyzed under the same "reasonableness" standard employed under the Fourth Amendment. See State v. Ravotto, 169 N.J. 227, 236 (N.J. 2001) ("Under the Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution, a search or an arrest by the police must be reasonable, measured in objective terms by examining the totality of the circumstances.") (citations omitted); see also Phillips v. Cullen, 1: CV 09-1706, 2011 WL 689602, at * 4 (D.N.J. Feb. 18, 2011) (citing cases).

As a result, for the same reasons that Plaintiff's claims under the Fourth Amendment survive summary judgment, summary judgment as to Plaintiff's claims under Article I, Paragraph 7 of the New Jersey Constitution is denied.

### G. Revelli's Motion to Sever

Revelli's motion to sever the claims against him is denied.  Fed. R. Civ. P. 21 provides, in relevant part, that the Court "[o]n motion or on its own, . . . may at any time, on just terms, add or drop a party.  The court may also sever any claim against a party."

Although summary judgment is granted on the conspiracy claim, Plaintiff's pattern and practice claim against the City of Camden remains.  Revelli's arrest, if found improper is part of the evidence a jury would use to determine the City's liability.  Also, while the evidence of conspiracy is thin, the fact that a few of the other officers, including Martinez and Concepcion, where present at the Revelli arrest and were poised to testify as witnesses on Revelli's behalf in Municipal Court, is relevant to the subsequent incidents involving those officers and creates a common thread in the incidents.  In addition, the fact that Finneman is investigated on four separate occasions for either a gun or drug offense that never materializes and is then cited, instead, for violating petty

32

Municipal Ordinances, coupled with the fact that the charges against Finneman are dismissed in each instance provides a sufficient nexus tying the cases together.  As a result, the Court will, at this time, deny Revelli's motion to sever.

### IV. Conclusion

For the reasons set forth above, and those on the record during the hearing in this matter on September 15, 2011, Defendants' motions for summary judgment are granted in part and denied in part.  All of the Defendants' motions are granted with respect to the civil conspiracy claim and the bystander liability claim.  Officer Revelli's and Officer Figueroa's motion for summary judgment is denied as to the claims of qualified immunity, the constitutional claims, and punitive damages.  Officer Revelli's motion to sever is also denied.  Officer Martinez's motion for partial summary judgment is denied as to the punitive damages claim.  Officer Concepcion's motion for summary judgment is denied as to the constitutional claims and granted as to the punitive damages claim.

An appropriate Order shall issue.


Dated: September 28, 2011



 /s/ Joseph H. Rodriguez_____
Hon. Joseph H. Rodriguez,
UNITED STATES DISTRICT JUDGE




33